**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| **JOHN DOE,**            ) | **CASE NO.** |
| ) | |
| **Plaintiff,**   ) | |
| **v.**          ) | **VERIFIED COMPLAINT FOR** |
| ) | **INJUNCTIVE, DECLARATORY, AND** |
| **INDIANA WESLEYAN UNIVERSITY,**   ) | **MONETARY RELIEF** |
| c/o David Wright, Statutory Agent   ) | |
| 201 South Washington Street,   ) | **DEMAND FOR JURY TRIAL** |
| Marion, IN 46953   ) | |
| ) | |
| ) | |
| **Defendant.**   ) | |

Plaintiff John Doe,[1] by and through counsel, for his Verified Complaint against Indiana Wesleyan University, states as follows:

## <u>INTRODUCTION</u>

1.     This action concerns the unjust and gender-biased decision of Defendant Indiana Wesleyan University ("***IWU***") to dismiss Plaintiff John Doe ("***John***") from IWU for at least one year for alleged sexual assault following a rushed, inquisitorial process.

2.     Just three weeks after Jane Roe ("***Jane***") falsely accused John of engaging in non-consensual sexual activity, a single IWU investigator, acting alone, without any hearing, rendered the decision to dismiss John from IWU for at least one year, ignoring key evidence of his innocence, making biased credibility determinations, and refusing to consider punishing his accuser for breaking multiple campus rules.

---

[1] Simultaneous to the filing of this Verified Complaint, John Doe is filing a Motion to Proceed Under Pseudonym in order to protect the identities of all students referenced in pleadings and exhibits.

1

3.      Even more disturbing, not only was John suspended in a process that took less than seven working days, IWU then gave him just seventy-two hours to try to prepare a request for a Case Review, during the time he was flying home to California for winter break, providing him access to the relevant documents for roughly one day.

4.      Two weeks later, a second IWU official denied his request for a Case Review, again acting entirely alone, without considering any new evidence and without any hearing, exhausting the administrative remedies afforded to John by IWU.

5.      Throughout the process, John never had an opportunity to make arguments to a panel of decision-makers, participate in a hearing, prepare for and present a case, confront and cross-examine witnesses, obtain legal representation, submit written statements, procure expert testimony, or appeal on the basis that the decision was wrong.

6.      In effect, the IWU investigator who handled this matter acted as prosecutor, judge, and jury in deciding John's fate, in a matter of days, without allowing him any practical ability to mount a legal defense.

7.      As more fully set forth below, this process violated Title IX by discriminating against John on the basis of his sex, failing to adhere to standards of basic fairness, and breaching the covenant of good faith and fair dealing in John's contract with IWU.

## PARTIES

8.      John is an undergraduate student in good standing at IWU and a resident of California.

9.      IWU is a private college with its principal place of business in Indiana.

2

10.    IWU has the authority to grant the injunctive relief sought in this Verified Complaint.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action: (i) under 28 U.S.C. §§ 1331 and 1343 because this action arises, in part, under the laws of the United States—Title IX of the Education Amendments Act of 1972 ("***Title IX***"), 20 U.S.C. §§ 1681 *et seq.*; and (ii) pursuant to the principles of supplemental jurisdiction under 27 U.S.C. § 1367.

12.    This Court has personal jurisdiction over IWU as it is domiciled in and/or conducts business in the State of Indiana.

13.    This Court is authorized to grant the declaratory relief sought under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## BACKGROUND FACTS

### Title IX Enforcement

15.    On April 11, 2011, The United States Department of Education's ("***USDOE***") Office of Civil Rights ("***OCR***") issued its now infamous "Dear Colleague Letter," which instructed universities on how to investigate and resolve complaints of sexual misconduct under Title IX, the statute that forbids discrimination on the basis of sex by institutions that accept federal funding ("***Dear Colleague Letter***" available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html).

16.    Educational institutions designed to educate America's youth are ill-equipped to adjudicate allegations of sexual assault, remain wary of bad publicity, and continue to overreact to

the threat of federal investigations, sanctions, and lawsuits, in part by discriminating against men on the basis of their sex.

17.     As a case in point, IWU has created a campus culture that views all men as potential predators and enforces discriminatory rules and policies, including by offering complainants complete amnesty for violations of campus rules uncovered as part of a sexual misconduct investigation, prohibiting all sexual activity outside of marriage, prohibiting students from visiting the dorm rooms of members of the opposite sex, and specifically forbidding the use of windows to enter dorm rooms.

18.     Dean Andrew Parker, the sole decision-making official in John's case, participated in a panel discussion at IWU on October 27, 2016 to promote an "It's On Us National Week of Action" and a screening of a documentary film entitled, "It Happened Here." *See* "IWU Participates in Campus Sexual Assault Awareness Campaign," *The Sojourn* (Oct. 27, 2016) (*available at* http://www.thesojourniwu.com/iwu-participates-in-campus-sexual-assault-awareness-campaign/).

19.     At this event, Laura Bronsink, IWU's Director of Student Conduct & Community Standards, encouraged students to wear teal "It's On Us" t-shirts as a sign of support for "survivors of sexual assault" and to sign an online "pledge" to combat sexual assault. *Id.*

20.     Other panelists included Nathan Herring, IWU's Executive Director of the Center for Student Success and Katti Sneed, IWU's Campus Victim Advocate Liason, whose clinical practice focuses on working with sexual abuse survivors. *Id.*

21.     During another panel discussion hosted by IWU on October 23, 2018, Katti Sneed stated that "not all men are offenders, but a very small percent of men commit most of the assaults

that happen, so it is more often than not that once a person has offended they've either done it a few times before that or will continue to." *See* "It's On Us Week," *The Sojourn* (Oct. 25, 2018), *available at* https://www.thesojourniwu.com/its-on-us-week/).

22.     The 2018 panel of IWU officials and students reportedly discussed that "[a] student found to be the victim of sexual misconduct or assault is entitled to protection," which "includes a no conduct [sic] order, change of class schedule and counseling services." *Id.*

23.     As colleges and universities like IWU become quasi-criminal investigators, they institutionalize unfair procedures that lead to unfair and unreasonable punishments of students accused of misconduct.

24.     OCR has warned schools to provide basic procedural protections to students, instructing that grievance procedures must provide "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence," and "equitable grievance procedures," and that "serving as the Title IX coordinator and a disciplinary hearing board member … may create a conflict of interest." *See* Dear Colleague Ltr.

25.     In a 2016 enforcement letter, OCR determined that Wesley College violated Title IX regulations when the school imposed interim disciplinary measures on an accused student without even speaking with him or attempting to understand his view. *See* Ltr. of Beth Gellman-Beer, OCR Supervisory Attorney to Wesley College (Oct. 12, 2016) (*available at* https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/03152329-a.pdf)     (not appropriate to impose an interim suspension on the same day an incident was reported, without interviewing the accused student or providing him with an opportunity to challenge the evidence

or explain why the proposed suspension was unjustified: "a sufficient level of inquiry – that is not here evident – must be taken in determining the appropriateness of interim suspensions.").

26.     Further, in 2017, in interim guidance issued after rescinding the Dear Colleague Letter,[2] OCR "cautioned" schools "to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication." Q&A on Campus Sexual Misconduct, Sept. 22, 2017, at 5 (available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf).

27.     OCR advised that written notice of any allegations should be provided to an accused "with sufficient time to prepare a response before any initial interview" and that parties subsequently "should have the opportunity to respond to [a] report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility." *Id.* at 4-5.

28.     OCR instructs schools to "maintain documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings." *Id.* at 5.

29.     Further, OCR recently drafted new regulations that, upon taking effect, will expressly require "live cross-examination at a hearing" as part of all university grievance processes. *See* 2018 Notice of Proposed Rulemaking, at 57 (available at https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf); *id.* at 52 ("[f]or institutions of higher education, the recipient's grievance procedure must provide for a live hearing" and "[a]t the hearing, the decision-maker must permit each party to ask the other party and any witnesses

---

[2] Even though USDOE formally rescinded the 2011 Dear Colleague Letter on September 22, 2017, schools continue to enforce the policies and procedures instituted in response to it.

all relevant questions and follow-up questions, including those challenging credibility"; "[s]uch cross-examination at a hearing must be conducted by the party's advisor of choice.")

30.    Under the proposed regulations, all university grievance processes must "[p]rovide both parties an equal opportunity to inspect and review evidence … , including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation." *Id.* at 53.

31.    Universities will be required to "[c]reate an investigative report that fairly summarizes relevant evidence and, at least ten days prior to a hearing … provide a copy of the report to the parties for their review and written response." *Id.* at 53; *id.* at 59-60 ("these requirements will facilitate each party's ability to identify evidence that supports their position and emphasize such evidence in their arguments to the decision-maker.").

32.    "To ensure that the complainant and respondent are able to meaningfully participate in the process and that any witnesses have adequate time to prepare," the proposed regulations require written notice "of all hearings, investigative interviews, or other meetings" to ensure "sufficient time for the party to prepare to participate in the proceeding." *Id.* 55-56.

33.    Critically, the proposed regulations also require that the "decisionmaker(s) … cannot be the same person(s) as the Title IX Coordinator or the investigator(s)." *Id.* at 63-64.

34.    As the Department puts it:

Requiring the decision-maker to be different from any person who served as the Title IX Coordinator or investigator forecloses a recipient from utilizing a "single investigator" or "investigator-only" model for Title IX grievance processes. The Department believes that fundamental fairness to both parties requires that the intake of a report and formal complaint, the investigation (including party and witness interviews and collection of

7

documentary and other evidence), drafting of an investigative report, and ultimate decision about responsibility should not be left in the hands of a single person. Rather, after the recipient has conducted its impartial investigation, a separate decision-maker must reach the determination regarding responsibility; that determination can be made by one or more decision-makers (e.g., a panel), but no decision-maker can be the same person who served as the Title IX Coordinator or investigator.

*Id.* at 65.

35.     Finally, OCR proposes requiring universities to provide "reasonably prompt timeframes for the grievance process, including for appeals …, but also provide that timeframes may be extended for good cause with written notice to the parties and an explanation for the delay." *Id.* at 46.

36.     This is because some universities "felt pressure in light of prior Department guidance to resolve the grievance process within 60 days regardless of the particulars of the situation, and in some instances, this resulted in hurried investigations and adjudications, which sacrificed accuracy and fairness for speed." *Id.* at 46.

### IWU's Student Conduct Process

37.     IWU's biased policies and procedures for the investigation and adjudication of alleged sexual misconduct do not comply with existing and proposed federal guidance, as outlined above, and the university's grossly deficient Process has led to an unjust decision against John that was motivated by gender bias.

38.     IWU's Student Handbook (the "***Handbook***") (attached hereto as Exhibit 1), contains a Student Conduct Process ("***Process***") that specifies how IWU handles allegations of violations of the Student Conduct and Community Standards.

39.     The Handbook states that the Process will be "fair and timely." Handbook at 39.

40.     The Handbook adds, in a discussion about Student Conduct and Community Standards, that "the primary goal of the conduct process is the growth of the student, not the penalty. As a result, since each student is an individual with unique needs, and at different growth stages, it is possible that cases involving similar violations may result in differing outcomes, sanctions, and/or assignments." *Id.* at 26.

41.     Despite these promises, at IWU, students accused of wrongdoing are not entitled to a hearing of any kind, whether formal or informal; no panel decides disciplinary matters.

42.     IWU students are not afforded the opportunity to cross-examine witnesses, submit expert testimony, or be represented by legal counsel. In fact, the Handbook expressly forbids students from using attorneys during the Process. *Id.* at 40 ("Any student involved (victim or accused) in the conduct process will have the right to be accompanied by an individual of their choice, excluding an attorney or other legal representation…. At no time may the accompanying individual participate directly in the hearing; he/she may only consult with the student.).

43.     This prohibition against being represented by counsel violates the 2013 Amendments to the Violence Against Women Act. *See* 20 U.S.C. § 1092(f)(8)(B)(iv)(II) (requiring university to provide both the accuser and the accused, "the same opportunities to have others present during an institutional disciplinary proceeding, ***including the opportunity to be accompanied to any related meeting or proceeding by an advisor of their choice*.") (emphasis added).

44.     Instead, a single official at IWU, either a Resident Director or the director of Student Conduct and Community Standards, investigates a report of wrongdoing, issues a decision on the matter, and imposes sanctions. *Id.* at 39.

9

45.     IWU is authorized to offer amnesty to complainants, stating that those who make "a good faith report of sexual misconduct … will not be subject to disciplinary action by the University of a conduct or policy violation that is related to and revealed in the sexual misconduct report or investigation, unless the University determines that the violation was serious and/or placed the health or safety of others at risk." *Id.* at 34.

46.     In this inquisitorial process, the accused student is contacted to set up a "conduct meeting" where he is "presented with the information in the report submitted," can "ask questions," and "present [his] own information regarding the report, including any 'evidence' [he] would like to present, names of additional witnesses, etc." *Id.*

47.     At this "conduct meeting," the investigating IWU official is empowered to make a decision on the spot, in his or her sole discretion, and impose sanctions. *Id.*

48.     Alternatively, the official may determine that "more information or further investigation is necessary" and make a decision "after the investigation is complete." *Id.*

49.     After the decision and sanctions are issued, the student can request a Case Review if he believes one of the following grounds is applicable: there is new evidence now available that was unavailable or unknown at the time of the "conduct meeting" that could considerably affect the outcome; IWU "significantly deviated from its stated procedures in such a way that materially affected the fairness of the student conduct meeting"; or the sanction "is substantially disproportionate to the severity of the violation." *Id.* 43.

50.     Requests for Case Review are reviewed by the Dean of Students or his designee, and "if it is determined that the request meets at least one of the grounds outlined," then the request

is forwarded to either the Case Review Board or the Director of Student Conduct & Community Standards. *Id.* at 43-44.

51.     The Case Review process is unfairly limited, and the Handbook expressly states that it is "not a re-hearing of the conduct process" and that "students, witnesses and other parties" cannot attend. *Id.* at 44.

52.     Instead, the information previously presented in the case is examined, "[t]he student's request for a Case Review is presented, as well as any other case-related notes and documentation," and "[a]ny other written statements from students given 24 hours in advance of the Case Review meeting…." *Id.*

53.     If the CRB or Director of Student Conduct & Community Standards "feel they are unable to make a decision without further investigation, a student may be asked to attend a future meeting to answer questions." *Id.* at 44.

54.     The decision of the Case Review decision is "the final decision in a conduct case; there are no further opportunities for review." *Id.*

### John Doe's Background And Recent Medical Condition

55.     Until recently, John was a senior in good standing at IWU, on track to graduate in May 2020.

56.     During his three and a half years on campus, he had an exemplary academic and disciplinary record and was a member of the baseball team.

57.     John has strong relationships with his coaches, including Coach Rich Benjamin, the Head Coach, Coach Kris Holtzeiter, the Pitching Coach, and Coach Brice Davis.

58.     John considers his coaches to be friends and mentors, and he often spoke with them daily about life, school, and his future, even visiting their homes for dinner.

59.     Last semester, he served as an intern in a new business venture of Coach Davis, helping to set up an e-commerce website, design logos, and purchase merchandise.

60.     On October 29, 2019, for the first time in his life, John unexpectedly suffered a grand mal seizure that caused him to fall in his dorm and sustain a serious concussion, which knocked him unconscious for more than 15 minutes.

61.     About a week later, on November 6, 2019, he suffered another grand mal seizure and was taken by ambulance to the hospital.

62.     Coach Benjamin stayed with John for 13 hours while John's parents flew to Indiana.

63.     During that time, Coach Benjamin regularly communicated with John's parents via text messages and phone calls to keep them up informed about John's condition, as Coach Benjamin and the other coaches were very concerned about John's health.

64.     Although John was released from the hospital after several days of testing, he subsequently suffered additional grand mal seizures that resulted in trips to the emergency room.

65.     After his hospitalization, John remained under concussion protocol with IWU, restricted by IWU from participating in any physical activity, taking anti-seizure medications, which cause drowsiness and excessive sleeping, and consulted regularly with IWU's doctor and training staff. IWU referred John to a cardiologist to determine whether his seizures were heart-related.

12

66.     Despite these frightening episodes, which revealed the emergence of a serious and unexpected chronic medical condition and caused John to miss significant class time, he worked hard to successfully complete the fall semester of his senior year.

### The Events Of November 16, 2019

67.     John and Jane met through mutual friends at the beginning of the fall 2019 semester at IWU.

68.     They "hooked up" several times, and on one occasion in October 2019, they engaged in consensual sexual intercourse.

69.     On the night of Saturday, November 16, 2019, John sent Jane a message asking if she wanted to come over to his dorm room.

70.     Jane snuck into John's dorm room by climbing up a rope ladder and crawling through the second floor window.

71.     Jane did not want to be noticed by campus authorities because the Handbook prohibits students from visiting the residence halls of members of the opposite sex without prior permission of Resident Directors, specifically prohibits the use of windows for entering or leaving residence halls, and forbids "sexual activity in relationships outside of marriage." Handbook at 23 & 34.

72.     Jane and John hung out together in a common area/living room of the dorm, made food together, and snuggled on a couch to watch a movie while John's roommate sat on another couch.

73.     After the movie, John's roommate went to his bedroom, and John and Jane engaged in sexual activity.

13

74.     According to John, the sexual encounter was consensual, beginning on the couch in the living room area, where Jane's pants were removed and he performed oral sex, and continuing in the bedroom, where they engaged in sexual intercourse. According to Jane, the encounter was non-consensual and took place only in the bedroom.

75.     Although Jane later asserted that she told John "no" and "stop" several times, John does not remember Jane saying anything like this or giving any indication that she wanted him to stop.

76.     On the contrary, John later stated that Jane appeared to be consenting throughout this encounter, given her body language, participation, and the fact that she followed John into his bedroom and continued the sexual activity after he asked her if she wanted to do so while they were in the living room area.

77.     Afterwards, Jane continued to hang out in John's dorm room talking with John and then spent time in his roommate's bedroom talking, laughing, and texting John in the other room.

78.     Later that night and the next day, Jane communicated multiple times with John and his roommate by text and snapchat, without any suggestion that something was wrong.

**IWU's Rush To Judgment**

79.     On Monday, November 18, 2019, a long-time IWU employee whose daughter attended the school informed IWU's Title IX Coordinator and Director of Risk Management, Neil Rush, that Jane was telling her friends that another student raped her.

80.     At the urging of Dean Rush, on Tuesday, November 19, 2019, Jane made a verbal, in-person report of sexual assault to Dean Andrew Parker, IWU's Deputy Title IX Coordinator and Investigator, who interviewed Jane about the allegation.

14

81.     In a letter sent the next day, on November 20, 2019, Dean Parker notified John of Jane's report, imposed a No Contact Order between the parties without even speaking to John, and scheduled a "conduct meeting" with John the next day, pursuant to the Process.

82.     One day later, on November 21, 2019, Dean Parker held the "conduct meeting" and interviewed John, who was accompanied by an assistant baseball coach. John had no time to prepare for the meeting.

83.     After the Thanksgiving break, during the last week of classes before final exams, Dean Parker interviewed other witnesses, including John's roommate.

84.     Upon information and belief, during these interviews, Dean Parker asked multiple witnesses questions about John's medical condition and emotional state, including questions that evidenced familiarity with specifics of his treatment and medication, even though John never authorized IWU to use his medical records for any purpose other than treatment.

85.     Throughout that week, John was focused on completing his presentations and making up class work from the two-three weeks of classes he missed due to illness.

86.     Dean Parker met with John a second time on December 9, 2019 allowing him to review Dean Parker's interview notes, ask questions, and write down questions for Jane if he wanted.

87.     The week of December 9-12, 2019 was finals week, and John was trying to focus on his studies when he had to meet with Dean Parker.

88.     John was not accompanied by anyone at this meeting, in spite of his physical condition.

15

89.     On December 10, 2019, after conferring with the Title IX Coordinator, Dean Parker interviewed Jane a second time to ask follow-up questions, and then emailed John and conferred with him by phone that evening after 8:00 p.m.

### Dean Parker's Decision

90.     On December 12, 2019, little more than three weeks after the investigation began, Dean Parker determined that John was "responsible" for violating the Handbook prohibition on sexual assault and assigned him the sanction of dismissal for one year or until Jane was no longer a student, whichever was longer.

91.     Dean Parker met with John to inform him of the decision just half an hour after John finished his last final exam.

92.     Dean Parker's decision was memorialized in a letter finding it was "more likely than not" that John engaged in sexual assault, defined as "sexual contact … to which any party does not give full and free consent." Handbook at 34-35.

93.     The letter stated that the decision was "rendered by" Dean Parker.

94.     Dean Parker wrote that "[w]hile there were multiple differences between the accounts" of John and Jane, "there were also some key similarities regarding details surrounding the evening (Nov. 16, 2019) and acts in question," and he wrote that he based his finding "largely on those similarities."

95.     Dean Parker's brief recitation of supposed similarities, which omitted key aspects of John's version of events, focused primarily on the parties' agreement that sexual intercourse occurred and ignored their stark disagreement about what happened before intercourse and whether the sexual activity was consensual.

96.     In fact, Dean Parker's letter highlighted the parties' disagreements by stating that Jane "indicated that she told [John] 'no' or 'stop' on several occasions," whereas John indicated that Jane did not suggest in any way that she wanted him to stop.

97.     Dean Parker stated that his "determination hinge[d] primarily on" the Handbook's statement that consent "cannot be assumed or implied based on silence, the absence of 'no' or 'stop,' the existence of a prior or current relationship, or prior sexual activity."

98.     In a separate letter, Dean Parker imposed the sanction of dismissal and stated that John could apply for readmission for the Spring of 2021 if he complied with the following steps: completing an online course entitled, "Consent and Respect," by January 4, 2020; writing a two-page paper by January 11, 2020 demonstrating what he learned as a result of his conduct and the online course, including answers to several specific questions; staying away from IWU property and not attending IWU-sponsored events; complying with the No-Contact Order; and participating in a re-enrollment interview following submission of a letter indicating his renewed commitment to abide by IWU's Policies and Community Standards.

99.     Dean Parker did not impose any sanctions on Jane for violating three campus rules, including the prohibition on engaging in sexual activity outside of marriage, the prohibition on visiting dorm rooms of members of the opposite sex, and the prohibition on using windows to enter the residence hall.

100.    In fact, Dean Parker made no mention whatsoever of these violations in his report, conducted no investigation of them, did not discuss how they might shed light upon Jane's actions and credibility, and did not indicate that he had offered Jane amnesty for the violations in exchange for her report of sexual misconduct against John.

17

### John Requests A Case Review

101.    Pursuant to the Process, John had just 72 hours after being notified of his dismissal on December 12, 2019 to request a Case Review.

102.    Rather than transmitting the case file to John to review as a matter of course, Dean Parker emailed John on the morning of December 13, 2019 and said that Coach Benjamin had "mentioned" that John "might be interested in a copy of the documents" but that any such request needed to come from John himself.

103.    John responded four minutes later, from the airport, where he was waiting for a flight home for winter break, to say that he wanted a copy of the documents.

104.    Dean Parker emailed the documents, but because John was traveling, he was not able to review them until later on the evening of December 13, 2019.

105.    The next day, December 14, 2019 John spent 2 hours at a neurology appointment and then the next 7 hours reviewing the redacted documents, talking with his roommate, and preparing his request for appeal in order to meet the deadline.

106.    On the afternoon of December 13, 2019, John's father was informed by Coach Benjamin that he and the other baseball coaches were instructed to have no further communication with John and his father.

107.    This came as a shock to John and his father, as John previously spoke with the coaches on a daily basis.

108.    On December 14, 2019, after spending approximately one day reviewing the relevant documents, John submitted a formal written request for a Case Review.

18

109.    John argued that additional evidence could affect the outcome; that IWU significantly deviated from its procedures in a way that materially affected the fairness of the conduct meeting; and that the sanction was substantially disproportionate to the severity of the violation.

110.    Among other things, John argued that during the investigation, he was never invited to provide a written statement or received a written statement from Jane or any witness; that Dean Parker's interview notes only contained information that Dean Parker chose to document; that statements by John's roommate were mischaracterized and that the roommate would submit a statement bolstering John's story and undermining Jane's; that Dean Parker ignored Jane's entry into John's room via rope ladder, ignored her texts to him after the encounter, and ignored evidence suggesting that a bruise she alleges he caused actually came from slipping on the ladder.

111.    John also pointed to language in the Handbook that consent can involve "voluntary actions," in addition to words, and pointed out that Jane cuddled with him and voluntarily engaged in consensual sexual activity in the living room and the bedroom without telling him no.

112.    John also noted that the Handbook does not state what the standard of proof is for the allegations against him.

113.    John criticized suggestions in Dean Parker's interview notes that his new medical condition was making him angry or aggressive and pointed out that he was not afforded the opportunity to rebut these statements or clarify his medical condition.

114.    During the time before IWU announced its decision on the request for a Case Review, John's father went to the IWU website to pay tuition for the spring semester and

19

discovered that the university already had removed John's spring 2020 class schedule and information about John's tuition expenses and financial records.

115.    On January 3, 2020, given his medical issues, John requested a 30-day extension of the deadline for him to take the online course and write his reflection paper.

116.    On January 7, 2020, Dean Parker granted an extension until February 10, 2020, sending John a patronizing letter that urged him to "look over the Reflection Paper questions" now and "jot down some notes/ideas for how you might answer" to make the writing "easier and more beneficial" because "[t]he further you get from the process, … it can be easy to forget things learned."

### IWU Denies The Request For A Case Review

117.    On January 2, 2020, just four days before the start of the spring semester, Brandon D. Hill, Vice President for Life Calling & Integrative Learning at IWU-Marion, determined that John's request for a Case Review did "not meet the [Handbook] criteria" that would justify a Case Review Board.

118.    Mr. Hill rejected all of John's assertions and made clear that in his view, Dean Parker's decision depended almost exclusively on his belief that Jane was telling the truth about consent and John was not.

119.    Like Dean Parker, Mr. Hill ignored a substantial body of evidence confirming John's version of events and gave no weight to John's steadfast denials and acceptance of responsibility for curfew violations and premarital sex.

120.    Inexplicably, Mr. Hill stated that numerous apparent factual discrepancies, such as whether furniture in the living room was moved as a result of sexual activity, whether Jane's pants

came off in the living room or the bedroom, whether she sent investigators with an accurate picture of the pants she was wearing, the means by which she entered the dorm room, the subsequent text and snapchat conversations, and information about John's medical condition and medication all were "not a factor" in the decision and "could not considerably affect the outcome now."

121.    Mr. Hill added further that John's roommate's statements were "not a factor" in Dean Parker's finding and that any new opinion or change in the roommate's story would "tend to erode" his "credibility" and would not "considerably affect the outcome."

122.    Mr. Hill said that both parties' credibility and transparency were "given equal weight" and were "not a factor one way or the other" and that nothing in John's request affected the weight of the parties' credibility or could "considerably affect the outcome."

123.    Even though the Handbook said nothing about the standard of proof, Mr. Hill stated that students involved in conduct proceedings "receive a verbal explanation about the Process and that the preponderance of the evidence (more likely than not) standard will be used in a finding of responsibility."

124.    In short, Mr. Hill reiterated that Dean Parker's decision rested on the fact that John assumed his actions were acceptable and that even though he did not recall Jane telling him to stop, "it was improper for [him] to rely on the absence of a 'No' or 'Stop' as a substitute for 'Yes.'"

125.    In effect, IWU shifted the burden of proof onto John to prove he obtained Jane's consent, which violates OCR's proposed rule requiring universities to "[e]nsure that the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the recipient and not on the parties." *See* OCR Proposed Regs. at 137; *see also id.* at 54 (universities, "not complainants or respondents, must comply with Title IX, so the

burden of gathering evidence relating to allegations of sexual harassment under Title IX and determining whether the evidence shows responsibility appropriately falls to the recipient.").

126.    Mr. Hill concluded that because sexual assault is a serious offense, the sanction of dismissal was proportionate and "not more severe than sanctions assigned in other similar cases" and at other academic institutions.

127.    Upon information and belief, Jane is no longer a student at IWU.

## **Irreparable Harm**

128.    IWU's flawed, rushed, inquisitorial process allowed a single university official to reach a decision motivated by gender bias that ignored evidence supporting John's version of events and undermining Jane's credibility.

129.    The resulting sanction of dismissal with a Title IX violation on his record, just months before John's graduation, has the potential to severely and irreparably harm his educational career, his reputation, and his economic prospects.

130.    At a minimum, John's life will be on hold for at least the next 12 months and his baseball career is over, but it is also uncertain whether IWU will allow him to return, even if he fulfills all of the conditions outlined in the sanctions letter.

131.    John also is at serious risk of losing future employment opportunities, as he likely cannot attend another school during the dismissal period, given that he is just a few upper division classes short of graduation.

132.    He likely cannot transfer to another comparable university, as such university would have to agree to accept IWU's academic standards and allow the transfer of all his credits, which is unlikely.

133.    Moreover, John's recently revealed severe medical condition, which was referenced in the investigative process, also clouds his future and exacerbates his feelings of severe distress and worry.

**CLAIM ONE**
**(Violation of Title IX)**

134.    John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

135.    Title IX, 20 U.S.C. §§ 1681 *et seq.*, provides, in relevant part, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

136.    Title IX is enforceable through an implied right of action affording an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

137.    IWU's conduct, as described above, discriminated against John, on the basis of his sex, through discriminatory, gender-biased implementation of the Process, in the context of pressure from OCR, the public, and the climate on IWU's campus.

138.    IWU ignored evidence supporting John's version of events and undermining Jane's credibility and imposed a sanction on him that is likely to severely and irreparably harm him for life.

139.    IWU imposed a no-contact order on John without interviewing him, or providing him with an opportunity to challenge the evidence against him or explain why the measure was unjustified.

140.    The IWU official involved appears simply to have chosen to believe Jane because she is a woman and to disbelieve John because he is a man.

141.    Moreover, the IWU official did not impose any sanctions on Jane for her violations of the IWU rules prohibiting sexual activity outside of marriage and visiting the dorm room of an opposite sex student, making no mention whatsoever of these violations in his report, and failing to consider how they might influence Jane's actions and credibility.

142.    IWU has failed to remediate its discriminatory actions against John and he is now at risk of irreparable harm to his reputation, his future educational and economic prospects.

143.    As a direct and proximate result of IWU's acts and omissions, John has suffered damages in an amount to be determined at trial.

## CLAIM TWO
### (Common Law Denial of Basic Fairness)

144.    John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

145.    School disciplinary proceedings must be conducted with basic fairness, and a private university cannot act arbitrarily or capriciously in disciplining a student.

146.    IWU's obligation to provide basic fairness in its proceedings is separate from and in addition to its contractual obligation to follow the rules it set forth in its Handbook.

147.    Thus, IWU had a duty, as a matter of common law, to ensure that the proceedings against John were conducted with basic fairness.

148.    IWU materially breached this duty of basic fairness, and a non-exhaustive list of IWU's material breaches are set forth above and in Count One, including but not limited to creating

24

and following a rushed, unfair process that allowed a single university official to impose severe sanctions on John, without affording him a hearing or the right of cross-examination or other procedural protections, and ignoring evidence that supported John's version of events and undermined Jane's credibility.

149.    As a direct, proximate, and foreseeable consequence of these breaches, IWU rendered an unfair decision to dismiss John for at least a year, a decision that was motivated by gender bias, and John's academic and career prospects, earning potential and reputation have been severely harmed.

150.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorney fees and costs.

## CLAIM THREE
### (Breach of Contractual Covenant of Good Faith and Fair Dealing)

151.    John incorporates by reference all of the preceding paragraphs of this Complaint as though fully rewritten herein.

152.    It is well-established in Indiana that the relationship between a student and a school is contractual and that the contract can include the university's policies relating to conduct and disciplinary proceedings.

153.    In determining whether a university breached any provision of its educational contract, a Court will determine whether the university's actions met the reasonable expectations of the student or whether the university acted in bad faith, arbitrarily, or capriciously.

154.    IWU offered enrollment to John, and he accepted that offer and paid IWU tuition.

155.    John satisfied all of the obligations required by IWU to remain in good standing and enrolled at IWU, with the understanding and reasonable expectation that IWU would act fairly and in good faith towards him.

156.    Therefore, a contract existed between John and IWU, which contained an implied covenant of good faith and fair dealing.

157.    Based on the foregoing facts, IWU breached this covenant of good faith and fair dealing for all of the reasons set forth above, including but not limited to IWU's failure to provide John with a fair process after he was accused of violating school policies.

158.    As a direct, proximate and foreseeable consequence of these breaches, John's academic and career prospects, earning potential and reputation have been severely harmed. He has sustained significant damages.

159.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorney fees and costs

**WHEREFORE,** John respectfully requests that this Court:

(A)    Award compensatory and punitive damages in an amount to be determined at trial;

(B)    Enter injunctive relief that vacates the decision of IWU to dismiss John for at least one year, vacates the No Contact Order that forbids his coaches from communicating with him, and removes from his academic record all references to the dismissal decision and any other related sanctions or disciplinary actions;

(C)    Issue a declaration that IWU's Process is unlawful;

(D)    Award court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney fees; and

(E)    Award such other relief as this Court may deem just and proper.

Dated: January 23, 2020

Respectfully Submitted,

*s/ Peter J. Agostino*
Peter J. Agostino (#10765-71)
ANDERSON AGOSTINO & KELLER, P.C.
131 South Taylor Street
South Bend, IN 46601
P: (574) 288-1510
F: (574) 288-1650
E: agostino@aaklaw.com

Susan C. Stone*
Kristina W. Supler*
KOHRMAN JACKSON & KRANTZ, LLP
1375 E. 9th Street, 29th Floor
Cleveland, OH 44114
P: (216) 696-8700
F: (216) 621-6536
E: scs@kjk.com; kws@kjk.com

*Applications for Special Admission – Pro
    Hac Vice pending
Counsel for Plaintiff John Doe*

## **JURY DEMAND**

Plaintiff respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 39.

*s/ Peter J. Agostino*
Peter J. Agostino (#10765-71)

*s/ Susan C. Stone*
Susan C. Stone

*s/ Kristina W. Supler*
Kristina W. Supler*

*\*Applications for Special Admission – Pro Hac Vice pending*

28