UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| JOHN DOE | ) | CASE NO. 1:20-cv-00039-HAB-SLC |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE HOLLY A. BRADY |
| -v- | ) | |
| | ) | |
| INDIANA WESLEYAN UNIVERSITY | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF JOE DOE'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

Pursuant to Fed. R. Civ. P. 65(b), Plaintiff John Doe ("John"), by and through counsel, requests that this Court enter an emergency temporary restraining order forcing Defendant Indiana Wesleyan University ("IWU") to contact Jane Roe ("Jane") to verify the truth of her assertion, revealed in a document IWU produced in expedited discovery, that Jane is HIV-positive.

John was unaware of this assertion until a few days ago, when his counsel discovered the document in expedited discovery, but he is now gravely concerned that Jane may have exposed him to HIV. Even worse, it appears that IWU has known of this possibility for months but never informed him of it, despite knowing that he suffers from a serious medical condition and has been quarantined at home with his family for weeks during the COVID-19 pandemic.

Despite requests by John's counsel, IWU refuses to contact Jane to require her to verify her HIV status. Absent a temporary restraining order directing IWU to do so, John will be forced to break quarantine to seek medical testing, potentially exposing himself to the novel coronavirus. With a serious preexisting health condition, John is especially vulnerable and will face irreparable

harm if forced to seek medical attention in the midst of a pandemic. IWU can avoid this by simply contacting Jane and requiring her to verify her HIV status.

Pursuant to Local Rules 7-1(b)(4) and 65-1(b), John submits a Brief in Support of this emergency Motion. Attached as Exhibit 1 is John's Affidavit in Support. For the reasons set forth above and contained in John's supporting Brief and Affidavit, John prays that this Court grant his Motion and enter a temporary restraining order against IWU.

Respectfully Submitted,

*/s/ Susan C. Stone*
Susan C. Stone*
Kristina W. Supler*
KOHRMAN JACKSON & KRANTZ, LLP
1375 E. 9th Street, 29th Floor
Cleveland, OH 44114
P: (216) 696-8700
F: (216) 621-6536
E: scs@kjk.com; kws@kjk.com

*Admitted Pro Hac Vice*

Peter J. Agostino (#10765-71)
ANDERSON AGOSTINO & KELLER, P.C.
131 South Taylor Street
South Bend, IN 46601
P: (574) 288-1510
F: (574) 288-1650
E: agostino@aaklaw.com

*Counsel for Plaintiff John Doe*

## BRIEF IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

### I. FACTUAL BACKGROUND

John incorporates the facts stated in his Verified Complaint and in his Motion for a Preliminary Injunction as if restated herein.

After this Court granted John's Motion for Expedited Discovery, IWU produced documents in response to John's Request for Production. Buried in IWU's production was a copy of an IWU Incident Reporting Form completed on December 11, 2019 by IWU Associate Professor Anneke Stasson. *See* IWU000099 (attached as Exhibit 2). At a time when she was requesting incomplete grades for her fall semester, Jane reported to Ms. Stasson that she believed she had been raped, and Ms. Stasson stated: "[Jane] then told me that she had been tested for STDs and she tested positive for HIV. It makes me really worried to think that the guy who gave her HIV is still on this campus."

As the document's footer makes clear, Dean Andrew Parker, the sole investigating/decision making official in John's case, reviewed and "modified" this report the next day, December 12, 2019, the very same day that he met with John to deliver his decision to expel John for at least a semester. Not only did Dean Parker choose not to consider Jane's report in his decision-making process, as indicated by a note at the top of the document, he also said nothing whatsoever about this very serious assertion when he met with John later that day, even though he knew full well that John already suffered from a serious medical condition that was causing him seizures.

In fact, for four months now, IWU has had this document in its possession, with an unverified suggestion that Jane, and by implication, John, have HIV, yet the university did nothing to let John know about it. In fact, it appears that IWU never investigated Jane's assertion that she had STD, a failure that shocks the conscience.

On top of all the other emotional trauma in his life right now, John is completely blindsided by this revelation and understandably terrified. *See* Doe Affid. (Ex. 1). He knows that he was not HIV-positive at the time that he and Jane engaged in sexual intercourse. But if Jane is HIV positive, he may well have contracted the virus from her. To learn from a document hidden in the midst of IWU's production that he could be infected with HIV was terrifying, to say the least. Given that John has a serious preexisting health issues, he may be at greater risk of infection from HIV. The situation is made all the more dire by the present COVID-19 crisis, to which John, as a person with serious underlying health conditions, is especially vulnerable. He has been quarantined at home with his family for weeks now.

Upon discovering this document, John's counsel contacted IWU's counsel and immediately requested that IWU contact Jane to verify with medical documentation the truth of her statement that she has HIV to avoid the need to be tested at a medical facility. *See* S. Stone letter to A. Shelby (Apr. 1, 2010) (Ex. 3). IWU refused to do so. *See* A. Shelby email to S. Stone (Ex. 4). Instead, recklessly downplaying John's concerns and the urgency of this development, IWU recommended that John order an HIV test online. Counsel immediately informed IWU's counsel that John would be filing a TRO.

IWU's alleged solution presents, quite literally, a life-threatening situation for John. Months have passed since John and Jane's encounter, and every day is a day that John should be taking appropriate HIV medication if he is indeed HIV-positive. With IWU refusing to contact Jane, John's only option is to seek medical attention in the midst of a global health crisis.

## II. LAW AND ARGUMENT

John is compelled to seek emergency relief from this Court due to IWU's refusal to act. He prays that this Court grant his emergency Motion for a Temporary Injunction and order IWU to contact immediately Jane and require her to verify the truth of her claim that she has HIV by providing medical documentation.

Temporary restraining orders are governed by Fed. R. Civ. P. 65(b), which states:

> A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

A restraining order is "an extreme and drastic remedy that should only be granted upon a clear showing of need." *Lewis v. Silverman*, 2005 U.S. Dist. LEXIS 20347 *4 (N.D. Ind. 2005). The standards that govern temporary restraining orders the same as those that govern injunctive relief. *Lundeen v. Kelly*, 2012 U.S. Dist. LEXIS 126669 *9 (S.D. Ind. 2012). A plaintiff must demonstrate that: (1) he is likely to succeed on the merits; (2) without a restraining order, he would be subject to irreparable harm; (3) the balance of harms weighs in his favor; and (4) relief is in the public interest. *Id.* Upon meeting the first elements, the Court then must balance the harm to the plaintiff if an order is not granted, versus the defendant's harm if such an order is granted. *Id.*

### A. John Is Likely To Succeed On The Merits Of His Claims.

As detailed in John's motion for a preliminary injunction, which John incorporates herein by reference, John already was likely to succeed on the three claims he has alleged against IWU: a Title IX violation, a violation of basic fairness, and a breach of the covenant of good faith and fair dealing. This outcome is even more certain now that it is clear that IWU deliberately covered

up a matter of potential life and death in order to ensure the outcome it wanted in John's case, showing more concern about ensuring his suspension, regardless of the evidence, than his health and well-being.

Indeed, while likelihood of success remains one of the factors courts must consider in deciding requests for emergency injunctive relief, the merit of this particular motion is, in many respects, independent of John's likely success. Given the magnitude of the irreparable harm John will suffer otherwise, the relief sought by motion is even more pressing than the outcome of this lawsuit. This motion raises an urgent matter with potential life or death consequences.

Nonetheless, it is important to note that John is even more likely to prevail on his Title IX claim in light of the new revelation. John did not just endure a biased and inquisitorial process that was driven by pressure to show results in sexual assault investigations, denied the chance to present a case, cross-examine witnesses, and full appeal rights. IWU was so determined to believe Jane and not John that it covered up Jane's explosive accusation that she had HIV, did nothing to investigate it and nothing to warn John that he might be at risk, even though IWU knew John had a serious medical condition. IWU never tried to determine whether Jane's assertion might be false and how that might reflect on Jane's credibility.  As if all that was not enough, the highest levels of IWU leadership directly intervened in John's case, in violation of the Handbook, to order that his request for a Case Appeal be denied.

Similarly, John is even more likely to succeed on his basic fairness claim in light of this revelation. Not only was IWU's inquisitorial process entirely devoid of fundamental protections, it is now clear that IWU has known for months that Jane was claiming she was HIV-positive but chose to do nothing with this information, such as attempting to verify it or informing John he may have been infected, despite knowing of John's existing health conditions.

John is also even more likely to succeed on the merits of his good faith and fair dealing claim, given that IWU covered up the report in which Jane claimed she was HIV-positive and failed to inform John, much less direct him to be tested and begin treatment if necessary, knowing full well of John's serious underlying health conditions. It is hard to image a more striking example of bad faith.

**B. John Will Suffer Irreparable And Potentially Life Threatening Harm Absent A Temporary Restraining Order**

John potentially faces irreparable harm in multiple ways, but none are more critical or dire than the harm of potential exposure to HIV and COVID-19 now facing him.

Courts have found irreparable harm present where an individual is "subject to risk of injury, infection, and humiliation." *See Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2nd Cir. 1995). Further, as the COVID-19 pandemic grows, courts every day are concluding that potential exposure to this virus is a risk of "severe, quite possible fatal infections…[which] constitutes irreparable harm warranting a TRO." *See Basank v. Decker*, 2020 U.S. Dist. LEXIS 53191 *13-14 (S.D.N.Y. Mar. 26, 2020). Further, "the deprivation of life-sustaining medical services [] certainly constitutes irreparable harm." *Mayer v. Wing*, 922 F. Supp. 902, 909 (S.D.N.Y. 1996).

The revelation that Jane told IWU officials months ago that she is HIV positive puts John in this kind of imminent danger in multiple ways. John suffers from serious health conditions, yet without relief from this Court, he will be forced to seek medical treatment to determine his HIV status in the midst of a pandemic, potentially infecting himself or his family with COVID-19. John is especially vulnerable to this deadly new virus in light of his existing health conditions, a fact that IWU carelessly disregards.

Rather than simply contacting Jane to determine the truth of her statement, IWU has left John with no choice but to seek immediate medical attention in the midst of a health crisis to

determine if he is HIV-positive. In a situation where every day and hour counts, there simply is not time to consider further objection from IWU, as its counsel has made clear it will not take action without direction of this Court. Moreover, IWU has had months and countless opportunities to correct this wrong and inform John of Jane's claim or recommend that he be tested as a result of his potential exposure to HIV. Instead, IWU did nothing, despite knowing of John's serious underlying health condition. IWU simply chose to cover up this information and not to investigate it or consider how Jane's statement might reflect on Jane's credibility if untrue. IWU chose to recklessly bury the statement in the midst of a lengthy document production. Absent the diligence of John's counsel, the statement may never have been found, and John may never have known of his potential HIV infection until too late. Such inaction constitutes the deprivation of life-sustaining medical services, which courts have found to be an irreparable harm warranting a temporary restraining order. *See Mayer*, 922 F. Supp. at 909.

      IWU would force John, already a vulnerable individual, to break his quarantine and seek out medical attention during a health crisis so that IWU is not inconvenienced with the burden of making a phone call. IWU's proposed alternative solution, that John order a test online and wait for the results, is offensive and insensitive, particularly when this dilemma was created by IWU's callous and deliberate indifference. In this situation, every moment counts, and there is no time to wait for a test to arrive and then wait to receive results. Nor is it a reasonable alternative for John to seek in-person medical attention when doing so would potentially expose him to the coronavirus, an equally dangerous and life-threatening virus. The simple solution is for this Court to compel IWU to contact Jane immediately and require her to verify her HIV-status through medical documentation. Otherwise, IWU's inaction will continue to place John at risk of imminent, irreparable, life-threatening harm.

It is no understatement to characterize as truly life threatening the harm that John would face by breaking quarantine and risking infection with COVID-19 to seek HIV testing. The possibility of HIV-infection alone has justifiably terrified John. That fear is only compounded by the reality that he may need to expose himself to yet another deadly virus to determine his HIV-status. Beyond the emotional distress being suffered by John at all times since he has learned that he may be HIV-positive, the risk of exposure to severe and potentially fatal infections can constitute irreparable harm. *See Shapiro* at 332; *Bansk* at *13-14. A restraining order must be issued in John's favor.

### C. The Balance of Harms and The Public Interest Weigh In John's Favor.

It should go without saying, any potential harm to be suffered by IWU if the restraining order is issued is slight to none-existent and is drastically outweighed by the harm John will suffer without relief from this Court. John asks only that this Court compel IWU to contact Jane directly to require her to provide medical evidence of her HIV status and determine the veracity of her prior statement. IWU's obligation can be resolved in a single phone call.

In contrast, John faces potentially life-threatening harm without this Court's immediate intervention. The longer IWU declines to contact Jane, the longer that an HIV infection potentially afflicting John can cause greater damage. And if IWU is not required to contact Jane, John will be left with the option of breaking quarantine to seek medical attention in the midst of a nation-wide crises where medical facilities are overwhelmed and vulnerable to COVID-19 infection. In order to determine whether he has HIV, John could expose himself or his family to COVID-19 as well. Further, this is a harm that only exists as a result of IWU's careless inaction. IWU has had months to reveal to John his potential exposure, and now tries to wash its hands of the fact that its failure to act may force John to put himself and his family at risk in the midst of a public health crisis.

Finally, the public unquestionably has an interest both in stemming the COVID-19 outbreak and in ensuring that individuals potentially afflicted with the similarly life-threatening condition of HIV can promptly and accurately learn their status and seek treatment if necessary. IWU faces no harm whatsoever if the Court provides the emergency injunctive relief requested, only the minor inconvenience of an uncomfortable phone call. On the other hand, John faces life-threatening harm, and the public interest undoubtedly is in his favor. John prays that this Court grant him the relief of a temporary restraining order against IWU.

### III.  CONCLUSION

John has satisfied the criteria necessary to justify a grant of an emergency temporary restraining order pursuant to Fed. R. Civ. P. 65. Absent relief, he will be forced to seek medical attention during a public health crisis to determine if Jane was truthful in claiming she is HIV-positive. John asks only that IWU be directed to contact Jane to require her to verify her HIV status by providing medical documentation, an obligation that can easily be resolved with a phone call. This relief is even more appropriate in light of the fact that IWU has had full knowledge of Jane's assertion and John's serious underlying health conditions for months but did nothing to inform John of his potential HIV exposure, leaving his counsel to uncover this information.

For the reasons outlined above and those contained in John's Affidavit in Support, John respectfully requests that this Court grant his Motion and enter a temporary restraining order in his favor.

Respectfully Submitted,

*/s/ Susan C. Stone*
Susan C. Stone*
Kristina W. Supler*
KOHRMAN JACKSON & KRANTZ, LLP
1375 E. 9th Street, 29th Floor
Cleveland, OH 44114
P: (216) 696-8700
F: (216) 621-6536
E: scs@kjk.com; kws@kjk.com

*Admitted Pro Hac Vice*

Peter J. Agostino (#10765-71)
ANDERSON AGOSTINO & KELLER, P.C.
131 South Taylor Street
South Bend, IN 46601
P: (574) 288-1510
F: (574) 288-1650
E: agostino@aaklaw.com

*Counsel for Plaintiff John Doe*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Emergency Motion for a Temporary Restraining Order was filed electronically this 3rd day of April, 2020. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties not receiving service through the Court's electronic filing system will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

*/s/ Susan C. Stone*
Susan C. Stone